AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT
for the
District of Massachusetts

| United States of America v. JASON DUHAIME | ) ) ) ) ) ) ) | Case No. 22-mj-4446-DHH |
|---|---|---|
| *Defendant* | | |

## ARREST WARRANT

To: Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)* JASON DUHAIME ,
who is accused of an offense or violation based on the following document filed with the court:

☐ Indictment ☐ Superseding Indictment ☐ Information ☐ Superseding Information ☑ Complaint
☐ Probation Violation Petition ☐ Supervised Release Violation Petition ☐ Violation Notice ☐ Order of the Court

This offense is briefly described as follows:

(1) Conveying false and misleading information under circumstances where such information may reasonably be believed and where such information indicates that an activity has taken, is taking, or will take place that would constitute a violation of Chapter 40 of Title 18 (prohibiting, among other things, the malicious conveyance of false information regarding an explosive), in violation of Title 18, United States Code, Section 1038(a); and
(2) Making materially false, fictitious and fraudulent statements and representations in a matter within the executive branch of the government of the United States, in violation of Title 18, United States Code, Section 1001(a)(2).

Date: 10/03/2022

*Issuing officer's signature*

City and state: Worcester, Massachusetts

United States Magistrate Judge David H. Hennessy
*Printed name and title*

### Return

This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____
at *(city and state)* _____ .

Date: _____

*Arresting officer's signature*

*Printed name and title*

Case 5:22-mj-01501-HJB Document 1 Filed 10/04/22 Page 2 of 14
Case 4:22-mj-04446-DHH Document 1-1 Filed 10/03/22 Page 1 of 14

FILED
October 04, 2022
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY: Breanna Coldewey
DEPUTY

AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
District of Massachusetts

| United States of America | ) |
|---|---|
| v. | ) |
| JASON DUHAIME | ) Case No. SA:22-MJ-1501-HJB |
|  | ) 22-MJ-4446-DHH |
|  | ) |
|  | ) |
|  | ) |
| *Defendant(s)* | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of **September 13, 2022** in the county of **Suffolk** in the

_____ District of **Massachusetts**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1038(a) | Conveying false information and hoaxes related to an explosive device. |
| 18 U.S.C. § 1001(a)(2) | Making materially false and fictitious statements in a matter within the executive branch of the government of the United States. |

This criminal complaint is based on these facts:

See attached affidavit of FBI Special Agent Steven Kimball.

☑ Continued on the attached sheet.

*Steven Kimball*
Complainant's signature

Steven Kimball, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 10/03/2022

*David H. Hennessy*
Judge's signature

City and state: Worcester, MA         Hon. David H. Hennessy, USMJ
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR CRIMINAL COMPLAINT

I, Steven Kimball, being sworn, depose and state as follows:

1.  I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since 2005. I am currently assigned to one of the Boston Field Office's counter-terrorism squads. Among other things, I am responsible for conducting national security investigations of potential violations of federal criminal laws as a member of the Joint Terrorism Task Force. I have extensive training and experience related to national security investigations, as well as matters involving domestic and international terrorism. I have participated in the execution of numerous federal search and arrest warrants in a variety of criminal investigations. From 2005 until 2008, I worked as a Special Agent in the FBI's Newark office conducting both domestic and international terrorism investigations. From 2008 to 2011, I worked at FBI headquarters on domestic and international terrorism matters; during a portion of that time, I served as a supervisor for terrorism cases. Since 2012, I have served in the Boston office conducting primarily domestic terrorism investigations.

2.  I submit this affidavit in support of a criminal complaint charging Jason Duhaime ("DUHAIME") with intentionally conveying false and misleading information related to an explosive device in violation of Title 18, United States Code, Section 1038(a), and making materially false statements to a federal law enforcement agent in violation of Title 18, United States Code, Section 1001(a)(2).

3.  DUHAIME is employed as the New Technology Manager and Director of the Immersive Media Lab at Northeastern University in Boston, Massachusetts ("Northeastern"). In a recorded 911 call and in a subsequent recorded conversation with a federal law enforcement agent, DUHAIME reported that he was injured by "sharp" objects expelled from a plastic case (the "Subject Case") that he opened inside the Immersive Media Lab (the "Lab") on the evening of

1

September 13, 2022. DUHAIME also reported that the Subject Case contained a threatening letter directed at the Lab, authored by an unknown person or persons. DUHAIME's 911 call and his statements to the federal agent generated an enormous law enforcement response that included, among other things, the assistance of two law enforcement bomb squads, the evacuation of a large portion of Northeastern's Boston campus (Holmes, Meserve, Behrakis, Shillman, Ryer, Kariotis and Dockser halls, among others), and numerous campus-wide alerts issued by the Northeastern Police Department, one of which described an "explosion" at Holmes Hall.

4. I have probable cause to believe that certain information provided by DUHAIME to the 911 operator and to the federal agent—namely that he was injured by "sharp" objects expelled from the Subject Case and that the case contained a threatening letter—was fabricated by DUHAIME. As described below, evidence discovered during the FBI's ongoing investigation indicates that DUHAIME himself authored the threatening letter. I believe, based on the ongoing investigation, that the Subject Case contained no "sharp" objects, that no objects were expelled from the case when DUHAIME opened it, and that DUHAIME sustained no injuries as a result of opening the Subject Case. There is probable cause to believe, therefore, that DUHAIME conveyed false and misleading information related to an explosive device to the 911 operator, and that he made materially false statements to a federal agent about the Subject Case and the cause of his injuries.

5. The facts described in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement personnel and witnesses. This affidavit is intended only to show that there is sufficient probable cause for the requested arrest warrant and does not set forth all my knowledge about this matter. Unless they

appear in quotations, the statements of others described in this affidavit are set forth in sum and substance only.

## FACTS SUPPORTING PROBABLE CAUSE

6. At approximately 7:00 p.m. on September 13, 2022, DUHAIME called 911 from the Lab, which is located on the third floor of Holmes Hall on Northeastern's campus. DUHAIME told the 911 operator that he and a Northeastern student who worked in the lab ("Student #1") had collected several packages from a mail staging area on the first floor of Meserve Hall earlier that evening and brought them into the Lab. Among the packages were two opaque plastic cases—commonly referred to as "Pelican" cases—one of which was the Subject Case. DUHAIME brought the cases into a storage closet inside the Lab. DUHAIME said that when he opened the Subject Case inside the closet, "stuff flew out" causing injuries to his "hand." DUHAIME described the objects as "very sharp." DUHAIME also told the 911 operator that he found a "violent note" inside the case (the "Letter").

7. An officer from the Northeastern Police Department was first to arrive at the Lab after DUHAIME's 911 call. DUHAIME, who was wearing a long sleeve shirt, was seated at a table inside the Lab approximately twenty feet from the storage closet. Student #1 was also present. The Subject Case and the Letter were on a table adjacent to where DUHAIME was seated.

8. The Subject Case was empty. The inside and outside of the case did not bear any marks, dents, cracks, holes, or other signs that it had been exposed to a forceful or explosive discharge of any type or magnitude. Likewise, aside from several fold marks, the Letter was pristine. It bore no tears, holes, burn marks, or any other indication that it had been near any sort of forceful or explosive discharge. Images of the Subject Case and the Letter as they appeared when the Northeastern Police Officer arrived at the Lab are shown below:

3


[Subject Case and Letter]


[Letter]

4

9. DUHAIME raised his sleeves for the Northeastern officer, revealing several small, superficial marks or bruises on his lower forearms. DUHAIME's shirt, however, did not appear damaged. DUHAIME told the officer that a second plastic case—which DUHAIME said he brought into the Lab at the same time as the Subject Case—was still inside the storage closet. For safety reasons, the officer exited the lab with DUHAIME and Student #1. DUHAIME was subsequently transported to Beth Israel Deaconess Medical Center ("BIDMC") in Boston for evaluation.

10. Investigators from the Boston Police Department ("BPD"), FBI, United States Postal Inspection Service ("USPIS") and other law enforcement agencies subsequently responded to Holmes Hall. Bomb technicians from BPD and FBI also arrived on scene. Based upon the information provided by DUHAIME, the investigators and bomb technicians were concerned that the Subject Case may have contained harmful chemicals or contaminants and that the second case—the one that remained unopened inside the Lab's storage closet—could contain a similar explosive device. Consequently, Holmes Hall and several other nearby buildings were evacuated. Northeastern also put out several campus-wide alerts warning students about an "explosion" at Holmes Hall and telling them to avoid the area.

11. As Holmes Hall was being evacuated, BPD bomb technicians entered the Lab. FBI bomb technicians joined BPD a short time later. They observed the Subject Case on a table inside the Lab. It was empty and undamaged. Inside the storage closet, the bomb technicians observed a second case on the floor immediately inside the doorway. The case was latched shut. It did not appear to be damaged or tampered with in any way. The closet itself was cluttered but otherwise appeared normal. Although DUHAIME said that "sharp" objects had been ejected from the

Subject Case inside the closet, the bomb technicians did not observe any small objects or suspicious debris on the floor or elsewhere.

12. The bomb technicians x-rayed the second case and determined that it was empty. Nonetheless, out of an abundance of caution, the technicians opened the second case inside the closet using a render-safe tool. (The tool employed by the technicians used water, ejected at an extremely high velocity, essentially to open the case by breaking it apart.) In addition to breaking apart the second case, the render-safe tool caused damage to some areas of the storage closet, including a portion of one wall and several ceiling tiles. After it was determined that the Lab was safe, investigators collected and preserved the Subject Case and the second case. An initial examination of the cases and the surrounding area did not reveal any explosive chemicals or residues. Both cases were subsequently sent to the FBI Forensic Laboratory in Quantico, Virginia for further testing. The results of that testing are pending.

13. At approximately 10:00 p.m., a USPIS Inspector assigned to the FBI's Joint Terrorism Task Force (the "JTTF Agent") and an officer from the Northeastern Police Department interviewed DUHAIME at BIDMC. The interview lasted approximately ninety minutes and was audio recorded with DUHAIME's permission. Among other things, DUHAIME stated as follows during the interview:

- DUHAIME observed some packages and two black "Pelican" cases, including the Subject Case, in the mail staging area on the first floor of Meserve Hall on September 12th. He placed the cases into a lab adjacent to the mail area (the "Useability Lab") for safekeeping on September 12th or 13th but did not move them upstairs at that time.

- At some point during the evening of September 13th, DUHAIME asked Student #1 to assist him with collecting the packages and cases from Meserve Hall and bringing them to the Lab.

- DUHAIME and Student #1 went to the mail area to collect the packages and cases shortly before 7:00 pm on September 13th. DUHAIME carried the Subject Case and the second case upstairs and into the Lab. Student #1 carried the packages.[1]

- DUHAIME brought the two cases into a storage closet inside the Lab and shut the door behind him. Student #1 remained outside in the Lab. DUHAIME placed the cases on the ground inside the closet. He did not turn on the light because he was "in a rush."

- DUHAIME described what happened next as follows: "I unlock [the Subject Case] … and I open it up. And as soon as I opened it up, all this energy and, like, these things come flying out. And I had a long sleeve shirt, and they flew up underneath, basically, and hit my arm. The case went up and then it came down."

- Later during the interview, DUHAIME described a second time what happened when he opened the Subject Case: "I popped it – the latches – and then I started to open it up. And then I don't know how much it was open, but all this freakin' air, pressure, shit came flying out, like, and these little things – I felt them. I didn't necessarily see them 'cause it was dark, but they were, they hit me." DUHAIME said the Subject Case "flew up and then landed."

- DUHAIME then picked up the Subject Case, brought it into the Lab, and placed it on a table. According to DUHAIME, he then opened the Subject Case, discovered the Letter inside, read a portion of the Letter, and then placed the Letter on the table. He instructed Student #1 not to read the Letter because it contained threats. He called 911 and his supervisor shortly thereafter.

- DUHAIME formally resides in Texas with his girlfriend, travels to Texas "every two or three weeks," and sleeps in the Lab or in his office whenever he is in Massachusetts. He does not maintain a residence in Massachusetts even though he works full time at Northeastern.

- DUHAIME provided oral and written consent to search his cell phone, his office at Northeastern, and any electronic devices located inside his office.

14. The JTTF Agent told DUHAIME during the interview that it was a crime to knowingly make false statements to a federal agent. DUHAIME said several times that he was being honest, at one point towards the end of the interview saying, "I'm telling you the truth, the

---

[1] As of September 13, 2022, there were no security cameras in the Lab, outside the Lab, or in the first floor mail area in Meserve Hall. DUHAIME appears to have been aware of this fact. During his interview with BPD, *see* FN 2 *infra*, DUHAIME told the detectives there were no cameras in these areas. DUHAIME said that he had asked for cameras to be installed "a million times."

7

Case 1:22-mj-04446-DHH   Document 1-1   Filed 10/04/22   Page 10 of 14
22-mj-4446-DHH

whole truth, and nothing but the truth so help me God." DUHAIME was released from BIDMC shortly after the interview ended.[2]

15. Federal agents also interviewed Student #1 on the evening of September 13th and again on September 19th. Student #1 relayed the following information to the agents during those interviews:

- Student #1 was scheduled to work in the Lab from 10:00 a.m. until 6:30 p.m. on September 13th. Shortly before Student #1's shift ended, however, DUHAIME asked whether he would stay late to help DUHAIME collect some packages from the mail staging area on the first floor. This was the first time that DUHAIME had ever accompanied Student #1 to the mail area. (Student #1 had worked in the lab for approximately one year to that point.) Ordinarily, DUHAIME instructed Student #1 and the other student employed in the Lab to collect the packages themselves.

- When they arrived in the mail area, Student #1 observed two "Pelican" cases on the floor along with two other small packages. DUHAIME picked up the cases, telling Student #1 they were not as heavy as he expected them to be. Student #1 collected the packages. They then returned to the Lab on the third floor.

- When they arrived at the Lab, DUMAIME took the two cases into the storage closet inside the Lab. The closet light was on when DUHAIME entered the closet, and the door closed automatically behind him. Student #1 saw light emanating from under the closet door after it closed. Student #1 stayed outside, approximately 20 feet from the entrance to the closet.

- Shortly after DUHAIME entered the closet, DUHAIME yelled and then—within seconds—exited the closet. Student #1 did not hear any noises coming from inside the closet other than DUHAIME's voice.

- When DUHAIME exited the closet, he was holding the Subject Case in one hand and the Letter in his other hand. He placed the Subject Case and the Letter on a table inside the Lab. DUHAIME instructed Student #1 not to read the letter because it contained threats, leading Student #1 to believe that DUHAIME had reviewed at least a portion of the letter before exiting the closet.

---

[2] BPD detectives interviewed DUHAIME at BIDMC at approximately 9:00 p.m., roughly one hour before the JTTF interview. The BPD interview was audio recorded. By and large, DUHAIME's statements to the BPD detectives were consistent with his statements to the JTTF Agent. About opening the Subject Case, DUHAIME told the BPD detectives: "I opened it up. As soon as I opened it up, there was this rush of – I don't know how to explain it – energy, air, whatever. I had a long sleeve shirt on, so stuff came flying out of the case – these little, small pieces – and they hit me under the shirt, basically. The case went up in the air, though, at the same time and it fell."

8

- DUHAIME called 911 and then his boss, the general manager of the Lab. DUHAIME had difficulty speaking to his boss and otherwise appeared distraught, causing Student #1 to take the phone from him. An officer from the Northeastern Police Department arrived shortly thereafter.

16. Several of DUHAIME's statements to the JTTF Agent are inconsistent with Student #1's recollection of events. <u>First</u>, DUHAIME told investigators that he moved the "Pelican" cases into the Useability Lab (a locked lab space adjacent to the mail area) on September 12th or 13th so they would not be stolen. However, Student #1 reported that he and DUHAIME encountered the cases in the mail area *outside* the Useability Lab. <u>Second</u>, although DUHAIME claimed to have previously moved the cases from the mail area to the Useability Lab, he told Student #1 that he was surprised by how light the cases were when he picked them up. This indicated to Student #1 that DUHAIME had not lifted the cases before that time and, therefore, was unfamiliar with their weight. <u>Third</u>, DUHAIME claimed that the light was off when he entered the storage closet and opened the Subject Case. Student #1, however, recalled that the light was on when DUHAIME entered the closet. Student #1 specifically recalled seeing light emanating from under the closet door while DUHAIME was inside. <u>Fourth</u>, DUHAIME claimed that the Subject Case was propelled into the air after he opened it and that it landed on the ground. Student #1, however, did not hear any sound consistent with a hard plastic case striking the ground even though he was sitting just twenty feet from the closet. <u>Fifth</u>, DUHAIME said he removed the Letter from the case *after* he left the closet, whereas Student #1 recalled DUHAIME exiting the closet with the Letter in his hand. Student #1 specifically recalled DUHAIME commenting about the content of the letter without ever having looked at it in Student #1's presence, indicating to Student #1 that DUHAIME must have previously reviewed all or part of the Letter.

17. On September 14, 2022, DUHAIME contacted the Northeastern Police Department and asked to speak with law enforcement. The JTTF Agent and an officer with the Northeastern

9

Police Department subsequently spoke with DUHAIME at a hotel room in Boston. The interview was audio recorded. Once again, the JTTF Agent told DUHAIME that it was a crime to knowingly make false statements about a material matter to a federal agent. During the interview, among other things, DUHAIME expressly denied fabricating his story about the Subject Case, the Letter, or his injuries.[3]

18. Federal law enforcement agents searched DUHAIME's office at Northeastern on September 14, 2022. During the search, the agents found four computers, including a white Alienware laptop computer (the "Computer"). The Computer is owned by Northeastern. An FBI forensic examiner acquired a forensic image of the Computer and then analyzed that image using reliable forensic tools. During the examination on September 28, 2022, the forensic examiner discovered a word-for-word, electronic copy of the Letter stored in a backup folder. The Letter was stored as a ".asd" file, which I know to be a backup file associated with Microsoft Word. I am aware that certain word processing applications like Microsoft Word will automatically save files at set intervals (*e.g.*, every ten minutes) regardless of whether the user manually saves the document. These files are kept in a temporary folder for a set period, after which they are automatically deleted. The metadata associated with this file reflects a "Created Date/Time" of September 13, 2022, at 2:57 p.m. EST and a "Last Printed Date/Time" of September 13, 2022, at 4:02 p.m. EST. Although the forensic examiner's review is ongoing, none of the other computers found in DUHAIME's office appear to contain the Letter.

---

[3] DUHAIME made similar statements to a reporter affiliated with the Boston Globe that same day. According to an article published in the Globe on September 14, 2022, DUHAIME said, "I did not stage this, in no way shape or form…. They need to catch the guy that did this." *See* www.bostonglobe.com/2022/09/14/metro/investigation-underway-into-package-explosion-northeastern-campus.

10

19.     Based on this data, I believe the Letter was first created shortly before 3:00 p.m. on September 13th. This is inconsistent with DUHAIME's statements to the JTTF Agent insofar as he claimed the Letter was found inside the Subject Case, and that the Subject Case was present in the mail area in Meserve Hall on September 12, 2022. In other words, because the metadata indicates that the Letter was not created until September 13th, the Letter could not have been placed inside the Subject Case on September 12th.

20.     In light of the above facts, I believe the following to be true:

- DUHAIME's statements about the Subject Case and the Letter are untrue because they are belied by the lack of any physical evidence. (1) No "small" or "sharp" objects that could account for the marks on DUHAIME's arms were found in the storage closet, in the Subject Case, or in the Lab itself. (2) The Subject Case did not appear to have been tampered with and it sustained no physical damage. (3) The Letter also sustained no damage. Had the case expelled "sharp" objects like DUHAIME said, and had the letter been inside the case at the time, I believe the Letter would have sustained at least *some* damage. (4) Although DUHAIME was wearing a long-sleeve shirt when he opened the Subject Case, the shirt sustained no apparent damage. Had "sharp" objects been expelled from the Subject Case like DUHAIME claimed, I believe his shirt would have sustained at least *some* damage. DUHAIME's claim that the sharp objects "flew up" his sleeves is, I believe, implausible on its face.

- DHUAIME's statements about the Subject Case and the Letter are untrue because he apparently drafted and printed the Letter using the Computer several hours before calling 911. The Computer was discovered inside DUHAIME's office. An electronic copy of the Letter was autosaved to the Computer, likely without DUHAIME's knowledge. I believe DUHAIME intentionally did not save the file to avoid leaving any record of the Letter. The metadata associated with the file indicates that it was created and printed just hours before DUHAIME called 911. DUHAIME's suggestion that the Letter was placed in the Subject Case on September 12th, therefore, cannot be true. I believe DUHAIME dated the letter "9/12/22" in an attempt to bolster his false story that an unknown person or persons placed the Letter inside the case on September 12th.

- Given the lack of any physical evidence and the fact that the Letter was found on a Computer in DUHAIME's office, the significant inconsistencies between DUHAIME's story and Student #1's recollection of events support a finding that DUHAIME is not being truthful. *See* ¶ 16, *supra*. Notably, the fact that Student #1 saw DUHAIME exit the closet with the Letter in his hand, apparently aware that it contained threats, is further evidence that DUHAIME drafted the Letter before

11

entering the storage closet. Having drafted the Letter himself, I believe DUHAIME was already familiar with its contents before he opened the Subject Case.

## CONCLUSION

21. Based on the forgoing facts, and on my experience, training and discussions with other individuals involved in this investigation, I believe that probable cause exists to conclude that on September 13, 2022, DUHAIME intentionally conveyed false and misleading information related to an explosive device, under circumstances where such information may reasonably be believed and where such information indicated that an activity had taken place, that would constitute a violation of Title 18, United States Code, Section 844(e) (prohibiting the malicious conveyance of false information concerning threats to injure, kill, or intimidate persons by means of explosives), all in violation of 18 U.S.C. § 1038(a). In addition, I believe that probable cause exists to conclude that on September 13 and 14, 2022, DUHAIME knowingly and willfully made materially false, fictitious, and fraudulent statements to the JTTF Agent in a matter within the jurisdiction of the Executive Branch in violation of 18 U.S.C. § 1001(a)(2).

*Steven Kimball*
Steven Kimball
Special Agent, FBI

Sworn ~~and subscribed~~ to me telephonically this __3rd__ day of October, 2022.

*David H. Hennessy*
DAVID H. HENNESSY
UNITED STATES MAGISTRATE JUDGE

10:19 a.m.

12